United States District Court
Southern District of Texas
**ENTERED**
August 04, 2020
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | | |
|---|---|---|
| HOMERO  GONZALEZ MORALES, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 7:19-CV-319 |
| | § | |
| NORMA A LIMON, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER & OPINION</u>

On July 27, 2020 the parties appeared for a trial before the Court.[1] Plaintiff Homero Gonzalez Morales appeared in person and by his attorney Francisco Tinoco, both via Zoom. Norma A. Limon and the United States appeared through their attorney of record, David L. Guerra. After addressing preliminary matters, the Court proceeded to hear the evidence in the case in order to conduct its de novo review of the United States Citizenship and Immigration Service's ("USCIS") denial of Plaintiff's Form N-400 application for naturalization pursuant to 8 U.S.C. § 1421(c). After considering the evidence presented and the parties' arguments, the Court hereby **GRANTS** Plaintiff's application for naturalization for the reasons stated herein.

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff brings the instant action challenging the denial of his naturalization application against the United States of America and Norma Limon, the Harlingen Field Office Director of USCIS (hereafter, collectively "Defendants").[2] The parties agree to the following description of

---

[1] *See* Minute Entry dated July 27, 2020.
[2] Dkt. No. 1 at 1.

the facts or the facts are otherwise undisputed.[3] Plaintiff is a citizen of Mexico who has been living in the United States for more than twenty-three years, is married to a United States citizen, and has two daughters who are United States citizens.[4] On February 21, 2017, Plaintiff filed a Form N-400 naturalization application (hereafter, "N-400 application") with USCIS.[5] In that application, Plaintiff was asked, "Have you **EVER** been arrested, cited, or detained by any law enforcement officer (including any immigration official or any official of the U.S. armed forces) for any reason?"[6] Plaintiff answered, "No."[7]

On April 23, 2018, Plaintiff appeared for an interview regarding his N-400 application.[8] Therein, Plaintiff was placed under oath and an immigration officer, Juan C. Ochoa, reviewed the entire N-400 application with Plaintiff. In particular, Mr. Ochoa asked if Plaintiff had ever been arrested, cited, or detained by any law enforcement officer (including any immigration official or any official of the U.S. armed forces) for any reason.[9] Plaintiff once again answered, "No."[10] Mr. Ochoa then noted this in a handwritten note on Plaintiff's application,[11] writing "claims no prior arrests, detained by any law enforcement agency."[12] At the end of this review "Plaintiff swore, under penalty of perjury, that he knew the contents of the application, including [] six hand-written comments on the application made by [Mr. Ochoa]."[13]

After reviewing the N-400 questions with Plaintiff, Mr. Ochoa instructed Plaintiff that he intended to ask Plaintiff additional questions. According to Mr. Ochoa, the purpose of these

---

[3] Dkt. No. 30 at 4–6, ¶ 6. The parties stipulated to an agreed set of facts in the joint pretrial order and stipulated to the same set of facts at the July 27, 2020 bench trial.
[4] Dkt. No. 21 at 4, ¶ 25; *see also* Dkt. No. 2 at 2 (Plaintiff's naturalization application).
[5] Dkt. No. 1 at 2, ¶ 9.
[6] Dkt. No. 2 at 14 (emphasis in original).
[7] *Id.*
[8] Dkt. No. 26 at 3, ¶ 6.
[9] *Id.*
[10] *Id.*
[11] *See* Dkt. No. 35-1 at 14 (Plaintiff's annotated N-400 Application).
[12] *Id.*
[13] Dkt. No. 30 at 4, ¶ 6(E).

questions was to determine whether Plaintiff had ever assisted anyone to enter the United States illegally or had provided transport to anyone present in the United States illegally. Plaintiff agreed to answer further questions and Plaintiff was asked, and provided answers, as follows:

> Q: Have you ever been detained, cited, and/or arrested by any law enforcement agency such as local police, sheriff department, state police, or any immigration officer?
>
> A: No, I have only been stopped due to a broke tail light by the State police. All have been warnings.
>
> Q: Have you ever been questioned by an immigration officer regarding any incident at the bridge, check point, and/or anywhere else?
>
> A: No.
>
> Q: Has [an] immigration officer ever taken a picture of you and/or fingerprinted you before?
>
> A: No. Never.[14]

After asking these questions, Mr. Ochoa "confronted" Plaintiff with evidence of a September 12, 2012 incident, wherein Plaintiff and his family members were pulled over by a Border Patrol agent who discovered that Plaintiff's brother-in-law's tourist visa was expired.[15] Plaintiff immediately recalled the incident to Mr. Ochoa. At the end of this questioning, Mr. Ochoa asked Plaintiff to sign the English version of the sworn statement without providing him with a translated copy. Plaintiff signed the document.[16]

The facts of the 2012 incident are as follows. On September 12, 2012,[17] Plaintiff was driving a vehicle containing five of his family members when he was pulled over by Border

---

[14] Dkt. No. 35-2 at 1.
[15] Dkt. No. 26 at 3–4, ¶ 8.
[16] Dkt. No. 30 at 5–6, ¶ 6(G).
[17] It is worth noting that there is a discrepancy in the filings as to which date Plaintiff was pulled over: September 9, 2012 or September 12, 2012. Early filings and the N-400 denial letter provide that Plaintiff was pulled over on September 9, 2012. However, later filings, including the parties' joint pretrial order, indicate that Plaintiff was pulled over on September 12, 2012. *Compare* Dkt. No. 4 at 2 *with* Dkt. No. 30 at 5, ¶ 6(G).

Patrol agent Thomas R. Forest near Oilton, Texas.[18] Defendants claim Plaintiff was pulled over after he approached the Hebbronville, Texas checkpoint and "suddenly turned around and began traveling in the opposite direction"[19] within view of the checkpoint, but Plaintiff argues that the checkpoint was not visible to him. The parties agree to the following description of the incident:

> Plaintiff was requested by the agent who had pulled him over to follow him to a Border Patrol facility in Hebbronville, Texas. At that facility, [Plaintiff] and the other adults [in the vehicle] were photographed and fingerprinted, but were not handcuffed or placed in a locked cell. Plaintiff and the other occupants of the vehicle were questioned by Border Patrol agents, and their immigration documents were reviewed and verified . . . [A]fter approximately two hours, [they] were allowed to depart, with the exception of Plaintiff's brother-in-law, who was arrested and later voluntarily returned to Mexico.[20]

After the family was told they could leave the facility, Plaintiff asked a Border Patrol Agent whether this incident would affect any future application for naturalization.[21] Plaintiff claims the agent informed him that he would not be affected by this in any way and indicated that the incident was focused on Plaintiff's brother-in-law.[22]

On May 2, 2018, USCIS denied Plaintiff's naturalization application on the grounds that Plaintiff failed to establish he was a "person of good moral character," as required by the Immigration and Nationality Act ("INA") because he gave false testimony under oath with the intent to obtain an immigration benefit.[23] USCIS noted that Plaintiff gave the false testimony when he failed to disclose the September 2012 incident to Mr. Ochoa during the April 23, 2018

---

[18] Dkt. No. 30 at 6, ¶ 6(H).

[19] Dkt. No. 26 at 4, ¶ 8.

[20] Dkt. No. 30 at 6, ¶ 6(H).

[21] Dkt. No. 7 at 1.

[22] *Id.* Plaintiff testified that the immigration officer informed Plaintiff and his family that there "won't be any problems" with Plaintiff or any of his family members, and that the only issue was with Plaintiff's brother-in-law, who was going to be deported to Mexico.

[23] Dkt. No. 4 at 2 (Plaintiff's naturalization application denial).

interview after being asked about arrests, citations, or detentions; and when he denied ever being questioned, fingerprinted, or photographed by immigration officials.[24]

After receiving notice of his denial, Plaintiff wrote a letter detailing his explanation of the September 2012 incident and his subsequent interview in 2018.[25] It appears Plaintiff sent this letter to USCIS, but the recipient is unclear from the document, which is simply addressed to "Sir/Madame."[26] Therein, Plaintiff recounts the September 2012 incident. Plaintiff explains that he turned his vehicle around prior to being pulled over due to difficulty with his GPS, and states that he "did not lie in [his] interrogation for citizenship naturalization" but that he "unfortunately, misinterpreted the question about detention."[27] Plaintiff provides that he "was under the impression that the interrogator was asking [him] if he had ever been incarcerated and if this had resulted in a [taking] of [his] fingerprints."[28] In this letter, Plaintiff still insisted that he was not detained, stating "I hope my recounting of this story clarifies why I stand upon my answer that I have never been detained nor involved with smuggling acts."[29]

After Plaintiff drafted and potentially mailed this letter, he timely filed a Form N-336 Request for Hearing on a Decision in Naturalization Proceedings on May 31, 2018.[30] Plaintiff's request for hearing was denied on May 24, 2019.[31] The USCIS denial of Plaintiff's request for hearing "constitute[d] a final administrative denial of [Plaintiff's] naturalization application" and granted Plaintiff the right to "request judicial review of this final administrative determination by

---

[24] *See id.*
[25] *See* Dkt. No. 7.
[26] *Id.* The letter is dated May 4, 2018 and was notarized on May 23, 2018.
[27] *Id.* at 1.
[28] *Id.*
[29] *Id.*
[30] Dkt. No. 5 (Plaintiff's Form N-366 Request for Hearing on a Decision in Naturalization Proceedings).
[31] Dkt. No. 6 (USCIS's denial of Plaintiff's Form N-366 filing).

filing a petition for review in the United States District Court having jurisdiction over [Plaintiff's] place of residence."[32]

Plaintiff filed a "Petition for Review of Denial of Naturalization Application" (hereafter, "petition") in this Court on September 9, 2019 challenging the denial of his N-400 application on the grounds that he did not provide false testimony with the intent to obtain an immigration benefit during his April 23, 2018 interview.[33] Plaintiff's petition requested that the Court conduct a de novo review and hearing pursuant to 8 U.S.C. § 1421(c) and grant Plaintiff's application for naturalization at the conclusion of the hearing.[34] The Court now turns to its analysis.

## II. ANALYSIS

Plaintiff argues that he is a person of good moral character pursuant to 8 U.S.C. § 1427(a)(3) because he did not provide false testimony with the intent of obtaining an immigration benefit when he failed to disclose the September 2012 incident. In contrast, Defendants contend that Plaintiff did provide false testimony with the intent of obtaining an immigration benefit when he failed to disclose the September 2012 incident and as such, Plaintiff is not a person of good moral character and does not qualify for naturalization. The Court first turns to the legal framework governing Plaintiff's eligibility for naturalization, before summarizing the evidence presented at the bench trial in support of each party's argument.

### a. Legal Standard

Where an N-400 applicant is denied naturalization, he may file a petition for review in the United States District Court having jurisdiction over his place of residence pursuant to 8

---

[32] *Id.* at 2 (citing INA Sec. 310(c)); *see also* 8 U.S.C. § 1421(c).

[33] Dkt. No. 1.

[34] *Id.* at 4 (citing 8 U.S.C. § 1421 "A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of title 5. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.").

U.S.C. § 1421(c). Section 1421(c) provides that "[s]uch review shall be de novo, and the court shall make its own findings of fact and conclusions of law." The Court's de novo review is based on the facts established at trial, and the "deferential 'arbitrary and capricious' standard often applicable to administrative reviews does not apply in this context."[35] Where district courts find that the applicant's application for naturalization was improperly denied and that the applicant is eligible for naturalization, district courts typically grant the applicant's naturalization application or petition for naturalization outright[36] and remand to USCIS with instructions to schedule the applicant's naturalization oath ceremony.[37]

As to the eligibility requirements for naturalization, "'Congress alone has the constitutional authority to prescribe rules for naturalization.'"[38] In conducting its review of an agency denial, the district court's task is to "ensure 'strict compliance with the statutory conditions precedent to naturalization . . .'"[39] A plaintiff challenging the denial of his application bears the burden of showing his eligibility for citizenship "in every respect."[40] "[T]he Government has a strong and legitimate interest in ensuring that only qualified persons are

---

[35] *Kariuki v. Tarango*, 709 F.3d 495, 502 (5th Cir. 2013).

[36] *See Hajro v. Barrett*, 849 F. Supp. 2d 945, 963 (N.D. Cal. 2012) (granting the plaintiff's petition for naturalization on the basis that the plaintiff satisfied the statutory requirements for naturalization); *Vahid-Dastjerdi v. Mueller*, No. CV M-09-84, 2011 WL 13135580, at *3–4 (S.D. Tex. Aug. 1, 2011) (finding that the plaintiff satisfied all requirements for naturalization, and directing the plaintiff to file a proposed final judgment reflecting the court's findings); *Ragoonanan v. U.S. Citizenship & Immigration Servs.*, No. CIV. 07-3461 PAM/JSM, 2007 WL 4465208, at *5 (D. Minn. Dec. 18, 2007) (granting the plaintiff's application for naturalization).

[37] *See Khan v. Chertoff*, No. C08-1448 RSM, 2009 WL 54236, at *3 (W.D. Wash. Jan. 6, 2009) ("The Court remands the case to USCIS solely for the purpose of naturalizing [p]laintiff. USCIS shall schedule an oath ceremony for [p]laintiff as soon as possible, and shall issue a Certificate of Naturalization to [p]laintiff that same day."); *Shweika v. Dep't of Homeland Sec.*, No. 09-CV-11781, 2017 WL 1100943, at *6 (E.D. Mich. Mar. 24, 2017) (granting the plaintiff's petition for naturalization and referring the case to USCIS for instructions regarding the Naturalization Oath Ceremony). Courts also remand to USCIS with instructions to grant the application for naturalization. *Mingyu Zhu v. Miller*, No. 3:19-CV-00035-AC, 2020 WL 1330235, at *8 (D. Or. Feb. 3, 2020), report and recommendation adopted sub nom. *Crosby v. Miller*, No. 3:19-CV-00035-AC, 2020 WL 1324996 (D. Or. Mar. 20, 2020) (magistrate judge recommending that the district court "vacate the . . . decision denying Petitioner's application for naturalization and remand this action to USCIS with instructions to adjudge that Petitioner is eligible for naturalization, and that her application for naturalization be granted.").

[38] *Kariuki*, 709 F.3d at 503 (citing *Fedorenko v. United States*, 449 U.S. 490, 506–07 (1981)).

[39] *Id.* at 504 (citing *Fedorenko*, 449 U.S. at 506–07).

[40] *Berenyi v. Dist. Dir., Immigration & Naturalization Serv.*, 385 U.S. 630, 637 (1967).

granted citizenship," and the Supreme Court "has often stated that doubts 'should be resolved in favor of the United States and against the [applicant seeking naturalization].'"[41]

The Immigration and Nationality Act (hereafter, "INA") provides that "[n]o person . . . shall be naturalized" unless he meets the following criteria:

> (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted permanent residence, within the United States for at least five years. . . .
>
> (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship; and
>
> (3) during all periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.[42]

Pursuant to the INA, a naturalization applicant has the burden of establishing all requirements for naturalization by a preponderance of the evidence.[43] However, courts have suggested, and the parties seemingly agree in the joint pretrial order,[44] that the standard is actually higher according to the case law. In *Berenyi v. District Director, INS*, the Supreme Court held:

> "[w]hen the Government seeks to strip a person of citizenship already acquired, or deport a resident alien and send him from our shores, it carries the heavy burden of proving its case by '*clear, unequivocal, and convincing evidence*.' But when an alien seeks to obtain the privileges and benefits of citizenship, the shoe is on the other foot. He is the moving party, affirmatively asking the Government to endow him with all the advantages of citizenship."[45]

Two circuit courts have interpreted this passage to mean that the applicant must prove all requirements for naturalization by "clear, unequivocal, and convincing evidence," rather than the

---

[41] *Id.* (citing *United States v. Macintosh*, 283 U.S. 605, 626 (1931)).
[42] 8 U.S.C. § 1427(a); 8 C.F.R. § 316.2(a).
[43] 8 C.F.R. § 316.2(b).
[44] Dkt. No. 30 at 6–12, ¶ 8 ("Agreed Applicable Propositions of Law").
[45] *Berenyi*, 385 U.S. at 636–37 (emphasis added).

"preponderance of the evidence" standard set out in 8 C.F.R. § 316.2(b).[46] However, district courts in the Fifth Circuit have rejected this heightened standard, noting that "[a]lthough two circuits . . . have held that the burden of proof required to prove good moral character is by clear and convincing evidence, no Fifth Circuit case has been found to support that proposition."[47] These courts also note that the statute is clear in setting out a preponderance of the evidence standard, and *Berenyi* only states that the "clear, unequivocal, and convincing evidence" standard applies to the government's revocation of naturalization.[48] On this basis, Fifth Circuit courts have held that applicants "must prove all criteria for naturalization by a preponderance of the evidence."[49] The Court agrees with this rationale. Without a definitive decision from the Supreme Court or Fifth Circuit indicating otherwise, the Court will not hold Plaintiff to a higher standard than that which is explicitly set forth in the statute. Thus, Plaintiff must prove his eligibility for naturalization based on a preponderance of the evidence.

Defendants agree that Plaintiff can satisfy the first and second requirements, and all other regulatory requirements for naturalization.[50] However, they argue that Plaintiff fails to meet the

---

[46] *See Dicicco v. U.S. Dep't of Justice I.N.S.*, 873 F.2d 910, 914 (6th Cir. 1989) (citing *Berenyi*, 385 U.S. at 636-37); *see also El-Ali v. Carroll*, 83 F.3d 414 (Table), 1996 WL 192169, at *4 (4th Cir. 1996).

[47] *Oropeza v. Napolitano*, No. CIV.A. H-09-2604, 2010 WL 4878837, at *7 (S.D. Tex. Nov. 23, 2010); *see also Saleh v. U.S. Dep't of Justice*, No. CIV.A. 12-425, 2013 WL 1288233, at *4 (E.D. La. Mar. 26, 2013) ("The cases cited by the Government are therefore unpersuasive, particularly in light of the clear wording of 8 C.F.R. § 316.2(b), and the fact that no Fifth Circuit case has been found in support of the Government's argument. This Court joins the vast majority of courts to address the issue in holding that Plaintiff must prove all criteria for naturalization by a preponderance of the evidence.") (citations omitted); *Saad v. Barrows*, No. CIV.A. 3:03-CV-1342G, 2004 WL 1359165, at *5 (N.D. Tex. June 16, 2004) (applying the preponderance of the evidence standard).

[48] *See Saleh*, No. CIV.A. 12-425, 2013 WL 1288233, at *4 (citing *Berenyi*, 385 U.S. at 636; *Hamdi v. U.S.C.I.S.*, No. EDCV 10–894 VAP (DTBx), 2012 WL 632397, at *10 (C.D.Cal. Feb. 25, 2012) ("In *Berenyi*, the Supreme Court unequivocally held that the Government must prove its case by clear and convincing evidence 'when it seeks to strip a person of citizenship already acquired.' Significantly, the Court did not address whether this standard applies to a naturalization applicant. The cases cited by the Government are therefore unpersuasive, particularly in light of the clear wording of 8 C.F.R. § 316.2(b) . . .")).

[49] *Id.*

[50] Dkt. No. 26 at 10, ¶ 23 (citing 8 U.S.C. § 1427(a); 8 C.F.R. § 316.2(a) ("to be eligible for naturalization, an alien must establish that he or she: (1) Is at least 18 years of age; (2) Has been lawfully admitted as a permanent resident of the United States; (3) Has resided continuously within the United States, as defined under § 316.5, for a period of at least five years after having been lawfully admitted for permanent residence; (4) Has been physically present in the United States for at least 30 months of the five years preceding the date of filing the application; (5) Immediately

"good moral character" eligibility requirement contained in 8 U.S.C. § 1427(a)(3).[51] To comply with this requirement, an applicant must prove he has continuously been a person of good moral character in the five years preceding his application for naturalization, up until the point of becoming a U.S. citizen.[52] Pursuant to 8 U.S.C. § 1101(f)(6), "no applicant may be found to be a person of good moral character who, within that period, 'has given false testimony for the purpose of obtaining any benefits' under the statute."[53]

To constitute false testimony made for the purpose of obtaining an immigration or naturalization benefit under the INA, the testimony must be an oral statement made under oath with the subjective intent of obtaining such a benefit.[54] In the Fifth Circuit, "'oral testimony before an immigration officer that the false assertions contained within the written application are true does constitute false testimony.'"[55] Pursuant to 8 U.S.C. § 1101(f)(6), "even the most immaterial of lies [made] with the subjective intent of obtaining immigration or naturalization

---

preceding the filing of an application, or immediately preceding the examination on the application if the application was filed early pursuant to section 334(a) of the Act and the three month period falls within the required period of residence under section 316(a) or 319(a) of the Act, has resided, as defined under § 316.5, for at least three months in a State or Service district having jurisdiction over the applicant's actual place of residence; (6) Has resided continuously within the United States from the date of application for naturalization up to the time of admission to citizenship; *(7) For all relevant time periods under this paragraph, has been and continues to be a person of good moral character, attached to the principles of the Constitution of the United States, and favorably disposed toward the good order and happiness of the United States;* and (8) Is not a person described in Section 314 of the Act relating to deserters of the United States Armed Forces or those persons who departed from the United States to evade military service in the United States Armed Forces.") (emphasis added)). Defendants agree, as they do with 8 U.S.C. § 1427(a), that Plaintiff satisfies all requirements contained in 8 C.F.R. § 316.2(a), except for the "good moral character" requirement contained in 8 C.F.R. § 316.2(a)(7).

[51] *Id.*; *see also* 8 U.S.C. § 1427(a)(3) ("during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.").

[52] *See* 8 U.S.C. § 1427(a); 8 C.F.R. § 316.10 ("An applicant for naturalization bears the burden of demonstrating that, during the statutorily prescribed period, he or she has been and continues to be a person of good moral character. This includes the period between the examination and the administration of the oath of allegiance.").

[53] *Berenyi*, 385 U.S. at 631 (citing 8 U.S.C. § 1101(f) ("For the purposes of this chapter-- No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was -- (6) one who has given false testimony for the purpose of obtaining any benefits under this chapter.")).

[54] *Kungys v. United States*, 485 U.S. 759, 780 (1988) (interpreting 8 U.S.C. § 1101(f)(6)).

[55] *Kariuki*, 709 F.3d at 506 (citing *Kungys*, 485 U.S. at 780).

benefits" "denominates a person to be of bad moral character."[56] The Supreme Court held that there is no materiality requirement within Section 1101(f)(6) because it exists solely to "identify lack of good moral character," rather than to prevent false data from being introduced into the naturalization process, as is the case with other sections of the INA.[57]

It is undisputed by the parties that while the answers provided in Plaintiff's N-400 application do not constitute testimony because they were not oral statements made under oath, Plaintiff's statements made during his April 23, 2018 interview with Mr. Ochoa did constitute testimony.[58] However, the parties disagree as to whether this testimony constituted false testimony made with the requisite intent to obtain the benefit of naturalization under the INA.

Whether a person had the subjective intent to obtain a naturalization benefit is a question of fact.[59] Courts typically inquire with the applicant as to why they provided the false testimony, as to get to their subjective intent. Courts have held that where an applicant "offers no evidence other than his self-serving assertions and conclusory statements to show any other reason for the false testimony he gave under oath," the applicant had the subjective intent of providing the false testimony for the purpose of obtaining a benefit.[60] Moreover, if the statement is made with the intent to foreclose a line of questioning that could influence the decision on an applicant's application, it is considered to be made with the intent to obtain a benefit.[61] The Supreme Court

---

[56] *Id.*; *see also Davis v Sessions*, 293 F.Supp.3d 678, 686 (S.D. Tex. 2018) ("so long as the statement is both false and made with the subjective intent to obtain an immigration benefit, it precludes a finding of good moral character under § 1101(f)(6).").

[57] *Id.* (citing 8 U.S.C. § 1451(a), which provides for the denaturalization of citizens whose citizenship orders and certificates of naturalization "were illegally procured or were procured by concealment of a material fact or by willful misrepresentation.").

[58] Dkt. No. 30 at 11, ¶ 8(K).

[59] *Kungys*, 485 U.S. at 782 (holding that whether Kungys possessed the subjective intent of obtaining immigration or naturalization benefits in making the misrepresentations must be resolved by the trier of fact) (citing *Pullman–Standard v. Swint*, 456 U.S. 273, 288 (1982); *Berenyi*, 385 U.S. at 634–635)).

[60] *Davis*, 293 F. Supp. 3d at 690 (citing *Islam v. Harrington*, 2001 WL 1335851, at *6 (N.D. Tex. Oct. 23, 2001); *Gonzalez–Maldonado v. Gonzales*, 487 F.3d 975 (5th Cir. 2007)).

[61] *Saleh*, No. CIV.A. 12-425, 2013 WL 1288233, at *1; see also *Ghidarpour v. Ortiz*, No. SA-12-CV-22-XR, 2013 WL 431818, at *6 (W.D. Tex. Feb. 1, 2013).

has noted that "[i]t will be relatively rare that the Government will be able to prove that a misrepresentation that does not have the natural tendency to influence the decision regarding immigration or naturalization benefits was nonetheless made with the subjective intent of obtaining those benefits."[62] "Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, were not deemed sufficiently culpable to brand the applicant as someone who lacks good moral character."[63] The requisite subjective intent is also not found when false testimony results from "faulty memory, misinterpretation of a question, or innocent mistake."[64]

If the false testimony bar to naturalization is found to not apply, the finder of fact must compare the applicant to the "standards of the average citizen in the community of residence" to determine whether the applicant is a person of good moral character.[65] Defendants offer no other basis outside of the answers given by Plaintiff during his interview in support of their contention that Plaintiff lacks good moral character. The Court now turns to the evidence submitted by the parties at the bench trial.

### b. *Evidence Submitted by Plaintiff*

In support of his contention that he did not provide false testimony with the intent of obtaining an immigration benefit, Plaintiff testified at the bench trial with the use of an interpreter regarding the events of 2012; his N-400 application and the government's subsequent denial; and his April 2018 interview. Plaintiff testified that on September 12, 2012, he and his family had traveled to Laredo, Texas from the McAllen, Texas area to take a family member for a medical procedure. He and his family members were returning to McAllen when his daughter

---

[62] *Kungys*, 485 U.S. at 780–81.
[63] *Id.* at 780.
[64] *United States v. Hovsepian*, 422 F.3d 883, 887-88 (9th Cir. 2005) (en banc). The parties cite to *United States v. Hovsepian* and agree to its application in the joint pretrial order. Dkt. No. 30 at 12, ¶ 7(M).
[65] 8 C.F.R. § 316.10(a)(2).

and niece indicated to him that he was not on the intended route. Plaintiff turned the vehicle around upon receiving this information. Plaintiff's intention was to return by the same route they had taken from McAllen to Laredo. Unbeknownst to Plaintiff, when he turned around he was within sight of the Hebbronville Border Patrol checkpoint.

Plaintiff and his family were then stopped and inspected by a Border Patrol Agent. During the stop, it was determined that Plaintiff's brother-in-law's visa was expired. The brother-in-law was then placed in a Border Patrol vehicle and Plaintiff and the rest of the family were asked to follow the Border Patrol agent to the station. At the station, the brother-in-law was separated from the family and the three adults were separated from the minors. After some time, Plaintiff and all but the brother-in-law were advised that they were free to leave.

When asked why he answered "no" to the question regarding arrests, citations or detentions, Plaintiff testified that to this date, he did not believe he had ever been arrested or detained. Plaintiff characterized the 2012 incident as an inspection regarding his brother-in-law. When asked how he defined arrest and detention, Plaintiff stated that he believed "arrested" meant someone being handcuffed and "detained" meant someone being "held behind a cell" or "in an enclosed place." Plaintiff emphasized: "That is my understanding. My intention was never to lie or give a bad comment to anybody that ever interviewed me, I just understand it that way."

When asked why he answered "no" to Mr. Ochoa's question regarding whether he had been questioned by immigration officials "at a bridge, checkpoint, and/or anywhere else," Plaintiff testified that he only remembers Mr. Ochoa asking him specifically about events at the "bridge." Because Plaintiff had never been questioned crossing the bridge between the United States and Mexico, Plaintiff answered no. Plaintiff testified that Mr. Ochoa then indicated to him

that an event at a checkpoint was appearing on the records, and Plaintiff explained the 2012 incident.

When asked why he answered "no" to Mr. Ochoa's question regarding whether he had ever been  photographed or  fingerprinted by immigration officials, Plaintiff testified that at the time of the interview, he did not remember being photographed or fingerprinted in 2012. Plaintiff stated that he later asked his wife about the 2012 incident and she remembered being photographed. As of the date of the bench trial, Plaintiff still insisted that he did not recall being photographed or fingerprinted in 2012.

Plaintiff also testified that after Mr. Ochoa took his sworn statement in 2012, he was not given a copy of his sworn statement in Spanish before he signed it. Rather, Plaintiff stated that Mr. Ochoa summarized it for him in Spanish. Plaintiff stated that his English is "limited," and that he "saw the document and [] signed it, thinking everything was going to turn out well."

After testifying on his own behalf, Plaintiff called his wife, Rosalinda Gonzalez, as a witness. Mrs. Gonzalez testified that as they turned around in the Hebbronville area in 2012, she could not see any checkpoint. Mrs. Gonzalez testified that when the family traveled to the Hebbronville facility after being pulled over, she did not feel she was under any sort of arrest or detention. Mrs. Gonzalez stated: "The officer always told us, 'You are going to pick up the belongings of this person,' my brother-in-law. He never told us we were arrested or detained, it was just a check and then we were going to pick up the belongings."

In addition to the testimony given at trial, Plaintiff also admitted various exhibits in support of his argument, including his N-400 application; N-400 denial letter; N-336 hearing request; N-336 denial letter; his own letter, presumably written to USCIS after his application was denied; and letters from his family and various members of his community attesting to his

good moral character.[66] In particular, Plaintiff's daughter submitted a letter confirming the events of the 2012 stop specifying that after her father did not recognize the road they were on, she and her cousin "rerouted the GPS" and as a result, the family took a different path.[67]

### c.   Evidence Submitted by Defendants

Defendants called Mr. Ochoa to testify regarding his investigation into Plaintiff's application for naturalization and his subsequent interview of Plaintiff on April 23, 2018. Mr. Ochoa testified that prior to Plaintiff's interview, he discovered the 2012 incident, which he considered to be a detention and suspected transportation of a person in the country illegally. Despite the fact that the Border Patrol Agents involved in the stop determined in 2012 that Plaintiff and his family members had not engaged in illegal transportation of Plaintiff's brother-in-law, Mr. Ochoa testified that he questioned Plaintiff about the 2012 incident during the 2018 interview upon suspicion that Plaintiff had engaged in the transportation of an individual in the country illegally. Mr. Ochoa testified that he first reviewed all the questions on the N-400 application, asking them verbatim in Spanish and noting Plaintiff's response on the application itself. According to Mr. Ochoa's annotated copy of Plaintiff's N-400 application, which Mr. Ochoa used to question Plaintiff during the 2018 interview, Mr. Ochoa asked Plaintiff if he had ever "helped anyone to enter, or try to enter, the United States illegally?" and noted on the application that Plaintiff "claim[ed] never been involved in helping someone enter U.S. illegally or transport while in the U.S."[68] Recognizing that the answer Mr. Ochoa wrote on his annotated copy of the application was broader than the actual question contained in the application because it included the "transport" of an individual and not just assisting someone in entering the country, the Court inquired with Mr. Ochoa as to whether he asked different or broader questions in the

---

[66] *See* Dkt. Nos. 2–7.
[67] Dkt. No. 7 at 6.
[68] Dkt. No. 35-1 at 15, ¶ 30(F).

interview in addition to those contained in the N-400 application. Mr. Ochoa testified that during the interview, he asked additional questions or questions that were broader than those contained in the N-400 application based on his belief that Plaintiff had engaged in criminal conduct in 2012. While Mr. Ochoa admitted that he had no basis for asking Plaintiff whether he had helped anyone to enter or try to enter the United States illegally, he testified that the basis of his questioning stemmed from his belief that Plaintiff had engaged in the transportation of an individual in the country illegally. Mr. Ochoa admitted that he did not want to prematurely disclose his knowledge of the 2012 incident preferring to see if Plaintiff would disclose the information voluntarily.

Mr. Ochoa also testified that at the time of the April 23, 2018 interview, he was aware Plaintiff had been photographed and fingerprinted by immigration officials on other occasions outside of the 2012 incident, when Plaintiff obtained his permanent residency status and when he first applied for citizenship. Yet, Mr. Ochoa stated that he was not referring to these instances during the 2018 interview when he asked Plaintiff about whether he had ever been photographed or fingerprinted by any immigration officials – rather, he was actually asking Plaintiff whether he had been photographed and fingerprinted during the 2012 incident and was hoping Plaintiff would disclose the incident.

Mr. Ochoa testified that after he asked Plaintiff the specific questions contained in the N-400 application and Plaintiff answered in the negative, Mr. Ochoa "confronted" Plaintiff regarding the 2012 incident stating, "Service records indicate that on September 9, 2012 you were detained my immigration. Please provide more details about this incident."[69] Mr. Ochoa testified further that after Plaintiff was asked this question, he willingly provided more details and there was no hesitation from Plaintiff in providing this information. Mr. Ochoa testified that

---

[69] Dkt. No. 35-2 at 2.

he waited until the end of the interview to ask Plaintiff specifically about the 2012 incident because he wanted to see if "[Plaintiff] would be able to tell me in his own words and of his own will, so that he could willingly disclose the information to me . . ."

Mr. Ochoa testified that there was no translator present during the interview. Mr. Ochoa explained that he acted as the translator and asked Plaintiff questions in Spanish, before immediately typing them into a document on his computer and translating Plaintiff's responses into English in order to create the sworn statement. Mr. Ochoa also testified that the English translations contained in the sworn statement were "exact answer[s]" provided by Plaintiff during the interview. The Court inquired with Mr. Ochoa as to how he asked the question regarding prior arrests, citations, or detentions in Spanish, and Mr. Ochoa translated the word "detained" to the Spanish translation, "detenido" and the word "arrest" to "arrestado. Mr. Ochoa testified that he read the entire sworn statement to Plaintiff in Spanish prior to Plaintiff signing the document.

During cross-examination, Mr. Ochoa stated that he considered the September 2012 incident to be a detention, which led to his recommendation that USCIS deny Plaintiff's application for his failure to disclose the incident. When asked what his definition of detention was, Mr. Ochoa struggled to provide a definitive answer. Yet, he testified that he was trained to know what a detention was and eventually stated that a person is detained "any time that you're being stopped, that you're being temporarily stopped or questioned. Detained by any law enforcement officer surrounding any event whenever they want to ask you questions regarding . . . whenever they have suspicion or when they want to know more information about something." The Court pressed Mr. Ochoa further in an attempt to clarify his answer:

| The Court: | "You believe *any* time you are stopped by *any* law enforcement officer and asked any questions, that that is a detention?" |
| Mr. Ochoa: | "No, your honor." |
| The Court: | "Well I thought that's what you just said?" |
| Mr. Ochoa: | "No, your honor. Detained would be when they ask you, like, for the example I was making, 'please follow me here, we're going to be in this room. You can't temporarily leave because you're not going to be able to leave this room, this area, until we clear up some information.'" |
| The Court: | "Okay so if you're told you can't leave, then you believe that is a detention, is that correct?" |
| Mr. Ochoa: | "Yes, your honor." |
| The Court: | "So if you're not told that you can't leave, do you still believe that is a detention?" |
| Mr. Ochoa: | "Can you repeat that question again, your honor?" |
| The Court: | "If you are not told that you cannot leave, would that still be a detention?" |
| Mr. Ochoa: | "Yes, your honor." |
| The Court: | "Okay, so then what characterizes a detention because it doesn't matter if you're told you can or cannot leave, that apparently does not characterize a detention. So, what in your mind characterizes a detention? |
| Mr. Ochoa: | "A detention, like I explained, being in another room, in a holding area when you're being questioned regarding any incident." |

Mr. Ochoa went on to testify that for an incident to be considered a detention, an officer need not ask an individual to follow them to a separate location, but that a detention could occur if an officer stops an individual on the street and asks them questions. When asked to recall the definition of "detention" under immigration law, Mr. Ochoa testified that he did not remember the exact definition. Mr. Ochoa also testified that he believed an applicant being untruthful in the interview was enough to make that individual ineligible for naturalization on the basis that the applicant was not a person of good moral character.

Defendants also called as a witness Thomas R. Forest, the Border Patrol officer that pulled Plaintiff and his family over in 2012. Mr. Forest had no independent recollection of the incident but testified based on his review of the 2012 report. Thus, Mr. Forest could not say whether he saw the vehicle turn around or just saw the lights of the vehicle as it turned and

started traveling in the opposite direction. After pulling Plaintiff over, Mr. Forest determined that Plaintiff's brother-in-law's visa was expired and he put Plaintiff's brother-in-law in the patrol car. Mr. Forest did not testify that he detained Plaintiff but rather that he asked Plaintiff and the rest of the family to follow the patrol car to the Hebbronville facility.

Defendants also called Frank Izaguirre, the Special Operations supervisor with U.S. Customs and Border Protection who was stationed at the Hebbronville facility in September 2012. Mr. Izaguirre testified that Plaintiff was detained during the incident in order to determine whether he or his family members were involved in the transport of an individual in the country illegally. After investigating the incident, Mr. Izaguirre determined that Plaintiff and his family members had not committed any criminal acts and the family was told they were free to go.

In addition to this testimony, Defendants admitted the following exhibits: Mr. Ochoa's annotated copy of Plaintiff's N-400 application; Plaintiff's sworn statement taken on April 23, 2018; and the 2012 investigation report signed by Mr. Forest and approved by Mr. Izaguirre.[70] The Court now turns to its analysis of the aforementioned evidence provided by both parties.

### d.  Legal Analysis

The question before this Court is whether the statements made by Plaintiff during his April 23, 2018 interview constitute false testimony with the intent of obtaining a naturalization benefit as to preclude him from being a person of "good moral character" who qualifies for naturalization. The parties are agreed to the fact that the statements constitute testimony but disagree as to whether they constitute false testimony with the intent of obtaining a naturalization benefit. Plaintiff argues that because he did not consider the September 2012 incident a detention, he did not provide false testimony with the intent of obtaining a naturalization benefit when he denied ever being detained by immigration officials.

---

[70] Dkt. Nos. 35-1–35-3.

Plaintiff's explanation that he considered the 2012 stop an inspection of his brother-in-law's immigration status is credible and plausible. There is no testimony that Plaintiff was ordered to follow Border Patrol, that he was advised he was not free to leave, that he was in any way physically restrained, that he was separated from his wife or adult daughter, that he was interrogated, or in any way deprived of any liberty. Furthermore, Plaintiff's testimony that when Mr. Ochoa asked him whether he had ever been questioned by immigration officials, Mr. Ochoa asked whether Plaintiff had ever been questioned at the "bridge," not a checkpoint is credible. In fact, Plaintiff was not questioned at the checkpoint in 2012; he was questioned the Border Patrol station —a different location. The Court also notes that the question asked by Mr. Ochoa was: "Have you ever been questioned by any immigration officer regarding any incident at the bridge, check point and/or anywhere else."[71] Mr. Ochoa admitted that the word "incident," as used in this question, actually referred to the questioning at the Hebbronville station and that there was no separate incident. Thus, the question could cause some confusion if interpreted as "have you ever been questioned about being questioned?". The Court finds credible Plaintiff's assertion that Plaintiff understood Mr. Ochoa's question regarding whether Plaintiff had been questioned by immigration officials as referring to whether he was questioned in relation to an arrest. It was clear to the Court that Mr. Ochoa's questions were based on his belief that Plaintiff had been involved in criminal conduct in 2012 and it is plausible that Plaintiff so understood the questions.

As to the questions regarding being photographed and fingerprinted by immigration officials, in his letter to USCIS written shortly after his N-400 denial, Plaintiff stated that he "was under the impression that [Mr. Ochoa] was asking [him] if [he] had ever been incarcerated and if this had resulted in a take [*sic*] of [his] fingerprints."[72] Moreover, during the bench trial,

---

[71] Dkt. No. 35-2 at 1 (Defendants' Exhibit No. 2, Plaintiff's Sworn Statement).
[72] Dkt. No. 7 at 1.

Plaintiff stated that he did not remember being photographed or fingerprinted in September 2012 and had to inquire with his wife as to whether this had actually occurred. The Court also finds credible Plaintiff's explanation given that Mr. Ochoa appeared to be under a mistaken apprehension of the 2012 events even before he started the interview.

In contrast, Defendants argue that Plaintiff's testimony was clearly false and made with the subjective intent of obtaining a naturalization benefit. As to whether Plaintiff was detained, Defendants merely state in their pretrial brief that "Plaintiff himself, in his pleadings in this case, has acknowledged he was detained in 2012," but Defendants fail to cite to where Plaintiff acknowledges this. Defendants further argue that Plaintiff was undoubtedly detained:

> [Plaintiff] was asked not just whether he had been arrested, but whether he had ever been detained. There is a difference in the meaning of those two words. The 2012 incident clearly qualified as a detention, both when Plaintiff was pulled over and questioned for some time, and certainly when he was taken to a nearby facility and photographed, fingerprinted and questioned at length about the situation involving his brother-in-law.[73]

Defendants offer no argument or testimony regarding why the 2012 incident "clearly qualified" as a detention. Defendants only offered the testimony of Mr. Ochoa, who was unable to proffer any consistent definition of detention, and Mr. Izaguirre, who testified that Plaintiff was detained in 2012. There is no testimony at all as to how long the roadside stop lasted, what questions beyond identification were asked at the roadside stop, or Plaintiff's being "questioned at length" at the station. As to Plaintiff's intent, Defendants argue that because Plaintiff inquired with a Border Patrol Agent in 2012 as to whether the incident would affect his application for naturalization, he seemingly had a motive to lie in the April 23, 2018 interview. Defendants state: "Plaintiff did not want to disclose [the 2012 incident], because he feared it might be viewed as assisting in the transportation of a person illegally in the country, and would adversely

---

[73] Dkt. No. 26 at 11–12, ¶ 26.

impact his effort to obtain citizenship through naturalization. His dishonesty in this regard now presents an impenetrable barrier to naturalization."[74]

The Court finds that Plaintiff did not provide false testimony with the intent of obtaining a naturalization benefit for three main reasons. *First,* Plaintiff's answers to his interviewer's questions regarding whether he had been detained, photographed, fingerprinted, or questioned by immigration officials, even if objectively or technically false, appear to be the product of Plaintiff's misunderstanding and the government's attempt to corner Plaintiff into perjuring himself despite this misunderstanding. As the Court has noted, the requisite subjective intent cannot be found where false testimony results from "faulty memory, misinterpretation of a question, or innocent mistake."[75]

This case clearly involves both an immigration officer's misconceived notion that Plaintiff was involved in criminal conduct and the misinterpretation of a question, particularly the question regarding detention. There is much ambiguity regarding the definition of the word "detention," both within the law itself and within the minds of individuals. Black's Law Dictionary defines the word as "The act or an instance of holding a person in custody; confinement or compulsory delay."[76] Courts routinely refer to any instance during which a person is pulled over by police and not "free to leave" as a detention.[77] A detention is typically thought to have ended when the person is free to go and the detention will be considered unconstitutionally prolonged in violation of the Fourth Amendment if the person is forced to stay

---

[74] *Id.* at 11, ¶ 25.

[75] *Hovsepian*, 422 F.3d at 887-88. As the Court has noted elsewhere in this Order, the parties cite to *Hovsepian* and agree to its application in the joint pretrial order. Dkt. No. 30 at 12, ¶ 7(M).

[76] Black's Law Dictionary (9th ed. 2014).

[77] *United States v. Sanchez-Pena*, 336 F.3d 431, 440 (5th Cir. 2003) ("Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave. In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed."); *United States v. Jones*, 234 F.3d 234, 238 (5th Cir. 2000) (noting that a detention continued to occur where the officers continued to question the passengers of a vehicle after their licenses were cleared).

after the officer either issues a citation or determines that no citation should be issued.[78] While courts may have come to this understanding after years of fact-specific analyses and varying interpretations of the word "detention," they still struggle to determine at what point a detention begins and ends within the confines of the Fourth Amendment. In the context of immigration law, the INA itself does not define "detention" and offers no guidance as to what the term means in this context. The Court is not convinced that the 2012 incident was in fact a detention. Plaintiff was asked to proceed to the Border Patrol station due to the brother-in-law's situation and it was determined that no criminal activity had taken place. The delay at the station appears to have been simply to await the determination about whether the brother-in-law would be released or detained.

Even if this Court were to find that the 2012 incident constituted a detention by adopting the opinion that a detention occurs anytime someone is pulled over or stopped and questioned by any law enforcement agency, Plaintiff still did not possess this understanding of "detention" at the time of his interview. As the evidence presented in this case demonstrates, the definition of "detention" is even more ambiguous in the minds of individuals than it is within the law. Mr. Ochoa, Plaintiff's own interviewer and a trained immigration official whose job it was to determine whether or not someone was detained, was unable to proffer a clear definition of detention.[79] The United States government could only state repeatedly in its briefings and arguments before the Court that the 2012 incident was "clearly" a detention, but such clarity appears to have been lost on Plaintiff and Plaintiff's interviewer. Plaintiff believed that

---

[78] *Sanchez-Pena*, 336 F.3d at 440.
[79] The Court also notes that Mr. Ochoa's understanding of the naturalization bar contained in 8 U.S.C. § 1101(f)(6) was incorrect. Mr. Ochoa testified that he believed an applicant being untruthful in the interview was enough to make that individual ineligible for naturalization on the basis that the applicant was not a person of good moral character. However, Mr. Ochoa was unaware of the very important additional component of this bar: the applicant has to make the false testimony with the intent of obtaining a naturalization benefit.

"detained" meant someone being "held behind a cell" or "in an enclosed place." The Court finds that Plaintiff gave credible testimony in this regard, as he has consistently insisted throughout this case that he was not detained based on this interpretation of the term.

The Court must also note that translation issues likely affected Plaintiff's interpretation of the question and understanding of the term "detention." While in the legal world and in the English language the words "detained" and "arrested" may have different meanings, their Spanish translations, "detenido" and "arrestado," are even more ambiguous and can be used interchangeably. Mr. Ochoa translated "detention" into Spanish as "detenido," which directly translates to multiple English words, including "in custody" and "arrested." Thus, in Spanish, the two words can be understood as having the same meaning.

Plaintiff's answers to his interviewer's questions regarding whether he has ever been photographed, fingerprinted, or questioned by immigration officials appear to be the product of a similar misunderstanding and faulty memory. Because these questions were asked *after* Mr. Ochoa asked Plaintiff if he had ever been arrested, cited, or detained, Plaintiff appears to have misinterpreted these questions, believing that they were asked in relation to an arrest.[80] This belief was reasonable, as Mr. Ochoa himself admitted that he was asking these questions in relation to Plaintiff's 2012 "detention." Mr. Ochoa testified that he was aware Plaintiff had been photographed, fingerprinted, and questioned by immigration officials on other occasions outside of the 2012 incident, including when Plaintiff applied for citizenship and when he applied for permanent residency. However, Mr. Ochoa admitted that he was really asking if Plaintiff had been photographed, fingerprinted, or questioned in 2012 and was hoping Plaintiff would voluntarily disclose the details of the 2012 incident. Plaintiff did not do so and the Court cannot fault him for this in light of his reasonable belief that he was not detained or arrested in 2012,

---

[80] *See* Dkt. No. 35-2 at 1.

and thus that he had never been photographed, fingerprinted, or questioned in relation to a detention or arrest. Further, it appears faulty memory also played a role in Plaintiff's answers, as Plaintiff testified that he did not recall being fingerprinted or photographed in 2012. The government argues this is not credible based on its contention that the incident had a major impact on Plaintiff as to solidify its details in his memory. However, the Court recognizes that fingerprinting and photographing someone can take a matter of seconds, given that in recent years it is almost always done digitally. Moreover, Plaintiff's testimony that he forgot this detail after almost six years is credible.

*Second*, not only were Plaintiff's answers to these questions the product of misinterpretations and faulty memory, but Plaintiff's entire perception of the 2012 incident seems to differ from that of the government. Based on the testimony of both Plaintiff and his wife, it appears the couple perceived this incident to concern only their brother-in-law's visa, rather than an investigation into their own wrongdoing. As Mrs. Gonzalez stated, "it was just a check and then we were going to pick up [my brother-in-law's] belongings." Defendants argue that Plaintiff's asking the Border Patrol Agent in 2012 whether the incident would affect a future application for naturalization proves that Plaintiff had the requisite subjective intent to conceal the 2012 incident in order to obtain naturalization. The Court disagrees, and contends that it demonstrates exactly the opposite. As Plaintiff testified, the agent told Plaintiff that this incident would not affect Plaintiff in any way, as it only pertained to Plaintiff's brother-in-law. If anything, Plaintiff's asking this question and receiving this answer supports Plaintiff's argument that he did not consider this a detention and did not have the requisite subjective intent, because he was assured by the immigration official that this incident pertained to his brother-in-law and would not affect him in the future.

*Third* and finally, to the extent Defendants argue that Plaintiff had an ulterior motive to lie in his interview, it seems USCIS may have had an ulterior motive to deny Plaintiff's naturalization application. Mr. Ochoa testified that he discovered the 2012 incident prior to the April 23, 2018 interview. He testified further that when he interviewed Plaintiff, his questions were guided by his *belief* that Plaintiff had participated in transporting an individual in the United States illegally in 2012, despite the fact that Mr. Izaguirre and other immigration officials on duty at the Hebbronville facility at the time of the incident determined that Plaintiff had not done so. Mr. Ochoa asked Plaintiff whether he had assisted anyone in entering the United States and whether he had transported anyone in the United States illegally.[81] He also asked Plaintiff if he knew of his brother-in-law's expired visa and whether he thought his brother-in-law had a "valid permit and/or travel authorization" while in the United States.[82] Plaintiff answered consistently each time, indicating that he did not know of the expired visa and that he believed his brother-in-law could travel because he had used the visa to come "in and out of the United States."[83]

In addition to this repetitive line of questioning by Mr. Ochoa, Defendants spent a significant amount of time questioning witnesses during the bench trial in an attempt to prove that Plaintiff turned around within visible sight of the Hebbronville checkpoint, as if to suggest that Plaintiff did know of his brother-in-law's expired visa at the time of the incident and was attempting to avoid inspection. Defendants argue that Plaintiff's turning in the opposite direction prior to reaching the checkpoint is evidence of Plaintiff's subjective intent to conceal the incident for fear that revealing it might result in the government denying his application upon the belief that he transported an individual in the United States illegally. However, USCIS found in 2012

---

[81] Dkt. No. 35-1 at 15.
[82] Dkt. No. 35-2 at 2.
[83] *Id.*

that Plaintiff had not participated in any criminal acts and an immigration official told Plaintiff explicitly that this incident concerned his brother-in-law and would not affect his application for naturalization in the future. Moreover, at no point during Plaintiff's testimony did the Court find Plaintiff to be so deceitful. Rather, the Court's impression of Plaintiff is that he is an honest person who did not intend to deceive anyone. Plaintiff's testimony – to the extent it was objectively false because Plaintiff has been fingerprinted, photographed, and questioned by immigration officials – was made as a result of his own misunderstanding of his interviewer's questions, forgetfulness, or confusion, and not with the intent of providing false testimony in order to obtain a naturalization benefit.

Because the Court has determined that Plaintiff did not provide false testimony with the intent of obtaining a naturalization benefit, the Court now turns to whether Plaintiff is a person of "good moral character" as to qualify for naturalization pursuant to the INA. Defendants admit that Plaintiff meets all other eligibility requirements for naturalization and that only the false testimony bar contained in 8 U.S.C. § 1101(f)(6) stood in the way of a finding that Plaintiff is a person of "good moral character."

Because the false testimony bar to naturalization does not apply, the Court must compare Plaintiff to the "standards of the average citizen in the community of residence" in making the good moral character determination.[84] Plaintiff has submitted dozens of letters from his family members and members of his community attesting to his good moral character.[85] Upon review of these letters, the Court finds Plaintiff is a person of "good moral character" pursuant to 8 C.F.R. § 316.2(a)(7).

---

[84] 8 C.F.R. § 316.10(a)(2).
[85] *See generally* Dkt. No. 7.

### III.   HOLDING

In light of the aforementioned, the Court finds based on a preponderance of the evidence that Plaintiff meets all eligibility requirements for naturalization. The Court hereby **GRANTS** Plaintiff's application for naturalization. The Court will determine, at the August 5, 2020 status conference whether it will remand the case to USCIS solely for the purpose of naturalizing Plaintiff or whether it will proceed to administer the naturalization oath itself.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 4th day of August, 2020.

Micaela Alvarez
United States District Judge